TIMOTHY COURCHAINE
United States Attorney
District of Arizona
MARIA R. GUTIERREZ
Assistant U.S. Attorney
Arizona State Bar No. 026659
GLENN B. McCORMICK
Assistant U.S. Attorney
Arizona State Bar No. 013328
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: maria.gutierrez@usdoj.gov
Email: glenn.mccormick@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-24-8062-PHX-JJT |
|---|---|
| Plaintiff, | |
| vs. | **UNITED STATES' SENTENCING MEMORANDUM** |
| Marc Adams Prieto, | |
| Defendant. | |

The United States of America submits this memorandum in support of sentencing in this case. For the reasons below, the United States requests that this Court sentence the Defendant, Marc Adams Prieto, to time served to be followed by three years of supervised release, the imposition of both the mandatory and special conditions, participation in a residential program, and community service. As stipulated in the plea agreement, the United States also requests that the Court specifically find beyond a reasonable doubt that the Defendant selected the intended victims of the mass shooting because of their race pursuant to United States Sentencing Guidelines § 3A1.1(a).

The United States' position is more fully set forth in this memorandum of points and authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.      FACTS

*Background and Overview of the Investigation*

In October 2023, Confidential Human Source (CHS) told the Federal Bureau of Investigation (FBI) in Phoenix that the Defendant had expressed a desire to incite a race-war prior to the 2024 United States Presidential election and that he had made alarming comments advocating a mass shooting that targeted "blacks, Jews, or Muslims."[1] According to the CHS, the Defendant believed martial law would be implemented shortly after the 2024 election and that the mass shooting should occur prior to the implementation of martial law to incite a race war.  The Defendant asked if the CHS was "ready to kill a bunch of people."  The CHS said that the Defendant claimed to have fought as a mercenary in Ukraine and killed Russian soldiers and he told the CHS that he, "will go to hell for these people...to get this thing started off for them."

The FBI learned that the Defendant was a vendor at a Crossroads of the West gun show in Prescott in March 2023.  Law enforcement agents contacted the individual who runs the Arizona-based Crossroads of the West gun shows.  That individual told agents that the physical description of the Defendant, a review of the show's table rental history, and actions associated with the Defendant at other shows (such as carrying around a long gun) matched the description and demeanor of a vendor that he knew by another name.  Records checks revealed that individual was an 84-year-old male who resided in Prescott Valley ("Individual 1").

The FBI determined that the Defendant lived at Individual 1's residence in Prescott Valley ("Prescott Valley residence") and acted as his caretaker. Additional record checks revealed that the Defendant had a Florida driver's license.  Law enforcement agents showed a photo of the Defendant to the Crossroads of the West gun show organizer, and

---

[1] The information in this section was disclosed to the Defendant through discovery.

he confirmed that he knew him by Individual 1's name.  On July 11, 2024, the FBI observed the Defendant running various errands, including visiting a Walmart in the Prescott area. Video and transaction records from the Defendant's visit to Walmart showed that the Defendant used Individual 1's credit card.

Over the course of the investigation, the FBI learned that the Defendant was extremely private, security conscious, and engaged in measures to remain anonymous. For example, he used a flip phone for communication only and did not connect to the internet; he did not use a computer to access the internet; he did not use credit accounts in his own name; he would not disclose where he lived; and he would not meet away from the gun shows, even for a meal at a restaurant.

Throughout the investigation, the Defendant falsely claimed that he traveled to Russia, the Middle East, Africa, and South America.  He also falsely claimed that he had combat training and knew how to fly airplanes.  There is no evidence that the Defendant has ever traveled outside the United States or that he has had combat training.

However, it was evident from the investigation that the Defendant is a firearms enthusiast with a vast knowledge of firearms.  The Defendant shared his vast knowledge of firearms with other firearms enthusiasts at the various gun shows that he attended.

*Planning at the Gun Show in Phoenix on January 20 -21, 2024*

Over the two-day period (January 20 – 21, 2024), the Defendant spoke with the CHS and an undercover agent (UCE) about carrying out a mass shooting at a yet-to-be-determined rap concert. The Defendant believed that the CHS and UCE shared his racist beliefs and were willing to help carry out a mass shooting to incite a race war.

The Defendant wanted to target Atlanta, stating that, "The reason I say Atlanta…why, why is Georgia such a f****ed-up state now? When I was a kid that was one of the most conservative states in the country. Why is it not now? Because as the crime got worse in LA, St. Louis, and all these other cities, all the n****** moved out of those (places) and moved to Atlanta. That's why it isn't so great anymore. And they've been there for a couple, several years."

The Defendant also told the CHS and UCE that he wanted to target a rap concert because there would be a high concentration of African Americans at the concert. The Defendant said he planned to leave confederate flags after the shooting to send a message that "we're going to fight back now, and every whitey will be the enemy across the whole country." The Defendant said he wanted to show "no mercy, no quarter" and advised that that they "can't have any feeling, they're not people. They're monsters as far as I'm concerned."

The Defendant asked the CHS to find a suitable event and venue as their target. The CHS recommended a "Bad Bunny" concert at State Farm Stadium in Atlanta that was scheduled for May 14-15, 2024. The Defendant approved of the selection, despite having no familiarity with the artist. He liked the selection because it was likely to draw the demographic he hoped to target.

For the mass shooting, the Defendant said he preferred that each have two rifles: an assault rifle and a bolt-action sniper rifle. Initially, the Defendant suggested the CHS and UCE use an AK-platform weapon, as AR variant rifles were less reliable.

*Planning Continues at Gun Shows in February and March 2024*

Over the course of the investigation, the Defendant sold two firearms to the UCE for use in a mass shooting. On February 25, 2024, at a gun show in Phoenix, the Defendant sold the UCE a Nodak Spud AK-47 rifle, for use in the shooting. On March 23, 2024, at a gun show in Prescott Valley, the Defendant advised the UCE that the AK-47 rifle he had sold him was too valuable to use in the mass shooting. As the plan had developed, it was decided that all firearms used in the shooting would be burned in Atlanta before they returned to Arizona. That same day, the Defendant sold the UCE a Quentin Defense AR-15 rifle to use in the mass shooting. After the sale, the Defendant told the UCE, "use this one," referring to the AR-15 rifle he had just sold to him.

The Defendant also engaged in extensive planning to carry out the shooting. The Defendant suggested that they travel to Atlanta before the attack to store weapons in the area, as the Defendant did not want to drive to Atlanta for the shooting with firearms in the

vehicle. The weapons would be hidden or discreet so only they would know their location. The Defendant also told the group that they would need to destroy the weapons.

Plans to drive from Arizona to Georgia in the days before the rap concert were also discussed. The vehicle, which was a 2005 pickup truck that was going to be provided by the UCE, had to be an older model with no electronic communication connection, such as On-Star, through which they could be tracked. The Defendant interrogated the UCE about the condition and reliability of the 2005 pickup truck. The Defendant, UCE, and CHS would take turns driving to make the trip without overnight stops, if possible. Plans were made to hide firearms in the bed of the truck, including using old construction material such as fiberglass insulation to hide the firearms, which was suggested by the UCE. Plans were also made to take fishing gear as a cover story, i.e. that they were just some old dudes from Arizona on a fishing trip to Georgia, because there are no good places to fish in Arizona. No credit cards were to be used, only cash. They would camp if necessary and would not stay in hotels. They would leave their phones at home. The Defendant suggested stealing an SUV in Georgia and killing the owner, to have an untraceable vehicle that they would later burn. The Defendant also suggested burning all evidence of their crime to avoid being stopped with anything that might tie them to the crime.

For the shooting itself, the Defendant emphasized that they should use multiple firearms. An assault style rifle for closer range shooting, and a more accurate long gun to contain the perimeter of the shooting area and maximize carnage. The Defendant discussed grandiose plans to use a speaker system to broadcast racist rhetoric during the shooting to make sure everyone knew the shooting was race motivated, and not a gang shooting. He also suggested that they should plant confederate flags and propaganda materials to similarly emphasize the reason for the massacre. The Defendant suggested that they wear hoodies to conceal their weapons and to blend in with the crowd.

Below are selected excerpts of conversations between the Defendant, the UCE, and the CHS at the February 2024 gun show.

| Month & Year | Speaker | Statement |
|---|---|---|
| February 2024 | UCE | And then you were talking about, thing wise. Long gun. Bolt gun. |
| February 2024 | Defendant | Yeah, I've like I, like, I would bring along a couple of hunting rifles or at least a hunting rifle, just a regular hunting rifle. |
| February 2024 | UCE | [overlapping voices] Ok, I was gonna ask [laughter] [unintelligible]. |
| February 2024 | Defendant | Because, because you wanted, you want to corral em. And som-some people might be trying to leave out of a corner. And you want to blast those guys. And once they get the idea that they are trapped then there's pandemonium. Now they're, now they're in a panic. An-an-and they can't get out. Now they are going to be crawling over each other to get out. They'll pu-, they'll pu-, they'll put people in front of them to get out. They'll grab, they'll grab another one on em and hold its-its-its a complete panic ...uhh, yeah yeah. I seen that uh |
| February 2024 | Defendant | So this thing, this thing [mocking gun noise] and it shoots fast, it goes [mocking gun noise]. You know you got to let it cool down a little bit, but you could still [mocking gun noise] that's what's gonna [unintelligible]. |
| February 2024 | UCE | In just a 243s. |
| February 2024 | Defendant | 243s is when they're coming on your flanks. They are looking for the exits. Any kind of an exit, a counter. Anything to duck under, kay. That's when you want to have their, like hunting rifles to shoot -em when they try to get [UI]. That way they know there is no escape. When they realize there is no escape, then they're going to try to grab each other, put in front. |
| February 2024 | UCE | Hmm, I-I was thinking, like semi au…you mentioned bolts. I was thinking semi-auto, you're right. |
| February 2024 | Defendant | Bolt action is for the flanks. |
| February 2024 | UCE | You're right |
| February 2024 | Defendant | Fast shooting semi-auto's are for when you got them corralled [unintelligible]. But there's going to be some that are going to be like all the way over there. At the, at the corner there |
| February 2024 | UCE | Right. |

| February 2024 | Defendant | where these events are. And you may not be able to, you know, aim right cuz you're going to be going back and forth, but a bolt action rifle with a scope, you could put a bead on them and hit em some place, hit em in the arm, wherever, just to-to knock them down. Then they're going to get the idea there's no escape. Once they get that idea of no escape, they wont be looking for the other exits anymore. They'll be looking just to stay alive. You know, it's like a level of survival |
|---|---|---|
| February 2024 | Defendant | You know? Because I can't get out but maybe I can put somebody on top of me. Or, or, or in front of me, to at least survive, [overlapping voices]- |
| February 2024 | Defendant | [overlapping voices] --but they, they won't. You have to kill hundred, two hundreds, three hundreds of -ern. |
| February 2024 | UCE | And the three going active, that's probably possible, right? With- |
| February 2024 | Defendant | You have to, you have to go in like a, like a- an animal, it has to be a [unintelligible]. Nothing else will work. But it has to be clear that it's not a gang related thing. It has to be like it's a racial. |
| February 2024 | Defendant | And then there will be a panic and you have to do it before the media finds out about it. You have to do it some mother****in whitey, cracker, they here they shooting us up they they killing us. You could say Long live the Klan, long live the Klan. White power, white power. So they'll call on the phone. And then it spreads beca- then they [unintelligible] before the media. If the media gets there and then there is no indication, then they'll say it's gang related right. And then the government will say it's gang related. And then they'll and then of course --nothing will happen. It's just another gang shooting [overlapping voices] |
| February 2024 | Defendant | [overlapping voices] you know? Nothing will happen. But they kill the s**t out of each other every, everyday. |
| February 2024 | Defendant | But if it looks a racial then, then they start putting it on their phones. And you hear the screaming - KKK that's the way. Whatever |

| February 2024 | UCE | Somebodies got like confederate flags over here |
|---|---|---|
| February 2024 | Defendant | You put them there and then, and then you, and then you have to shout. And so they, they [unintelligible] f***in whities in here killin us, oh what's we gonna do, what's we gonna do. Boom. Shots going off. And then they got to spread out through the social media world, before the media can [unintelligible]. That's the idea. Because you don't want the media being able to get there before [unintelligible] because they'll say it was gang related. And that'll, that'll quell the whole thing there won't be any. Any [unintelligible] |
| February 2024 | Defendant | Remember they're already primed to kill the white people. They're already out there knowing they can get away with it. Like I said, all you're doing is your turning their weapon and your turning it around back on them. But now your gonna have the average, like, you know, - oh you know Black people aren't so bad. Now they'll be killing those kind of people cuz they're easy pickins. and then they will be [unintelligible] that will all go out the door. We have to defend ourselves. |
| February 2024 | UCE | Yeah, Right, right. Yeah, that was- that was the part last time when we were like that's right because those were like oh they're all good, wait |
| February 2024 | Defendant | I mean that's how they think. They, oh, I had a couple nice black friends, blah blah blah, blah, blah. Okay, and that's, and then they grew up maybe in Chicago, whatever or maybe ...because a lot of these, a lot of people they're from the Northeast or [overlapping voices] |
| February 2024 | Defendant | Chicago, whatever, right. So that's how they think. But once they start, like those guys there? [unintelligible] Once those two guys come at ya with [unintelligible] and start killing. I don't care how many of you had as friends. Now you know they're going to kill you. [overlapping voices] |
| February 2024 | Defendant | And the survival mode is going to come out. Survival mode comes out. |

Below are selected excerpts of conversations between the Defendant, the UCE, and the CHS at the March 2024 gun show.

| Month & Year | Speaker | Statement |
|---|---|---|
| March 2024 | Defendant | So we have to see if we can pre-plant the weapons there |
| March 2024 | UCE | Right |
| March 2024 | Defendant | We'll see. We'll see if things progress here. Remember we have - see, it may not be May that we can do it. Maybe like June July. I'm thinkin - that the hotter, the better. The hotter the weather the better. |
| March 2024 | Defendant | Because people will be, you know want to be outside. |
| March 2024 | Defendant | Because there all drinking and everything and before the concert is over when it gets hot people can't think straight the humidity goes up people right when they're- |
| March 2024 | UCE | I've seen that happen |
| March 2024 | Defendant | Hot weather. Did you go to Kuwait or anything like that? |
| March 2024 | UCE | No not up in that part of the top. |
| March 2024 | Defendant | You said you went to? |
| March 2024 | UCE | Afghanistan and Somalia. |
| March 2024 | Defendant | See Afghanistan kind of reminds me of here. |
| March 2024 | Defendant | Yeah, we gotta get the maximum out of this thing. In hot weather, when people panic it is not a good combination for people. It has to be a total panic. They're calling in saying these f***in mother f****ers. |
| March 2024 | UCE | Yeah, I like the plan I like the audio saying what it says, right, like |
| March 2024 | Defendant | All n***ers gonna die you think you've won we're coming back we're back we're back. |
| March 2024 | UCE | No, it's perfect. |
| March 2024 | Defendant | but n***ers are warm weather people but even then, it's still the hot weathers gonna bother them cause everybody gonna be clumped together be sweating you know the heart racing, they'll be panicking. sweaty. |
| March 2024 | UCE | Yeah, some predator, predator 2, in the city. |
| March 2024 | Defendant | A lot of them might have hypertension to begin with too. cause of diet that they have. You gotta take everything into account |

*Planning at Gun Shows in April 2024*

During the April gun show, the Defendant brough up a possible alternate plan to shoot Jews at a synagogue or Muslims at a mosque. No specific locations were identified,

only general locations like California or somewhere in the Northeast, and the potential for such shootings to similarly start the Defendant's hoped-for race-war. Ultimately, the alternative did not develop significantly, and the Defendant appeared to stick with the planned shooting in Atlanta.

Below are selected excerpts of conversations between the Defendant, the UCE, and the CHS at the April 2024 gun shows.

| Month & Year | Speaker | Statement |
|---|---|---|
| April 2024 | CHS | Why Atlanta too? That's what a far distance or is there something closer? |
| April 2024 | Defendant | Because, well Atlanta, because that's the n****er hub of the United States. |
| April 2024 | UCE | That's the mecca |
| April 2024 | Defendant | That's the Mecca of the n****ers. That's where I mean Georgia itself—[overlapping voices] |
| April 2024 | CHS | So you'd want to go check it out first. And then how soon? |
| April 2024 | Defendant | I want to set this stuff up. |
| April 2024 | Defendant | I wanna set this, like the sound equipment up in different places. I gotta see what these venues look like, what our position is. You know, are we gonna be in open, plain sight? Or can we hide behind a berm or something like that? |
| April 2024 | UCE | Yeah, from the research I did of the spot, right, it says 'Atlanta' across the front of the building, and the venue's kinda in the corner. There's hotels [overlapping voices] |
| April 2024 | Defendant | I mean, is there like a little gully we could be in? |
| April 2024 | UCE | No, not at all. It's all pavement. It is all pavement. Parking lot, so the venue-- [overlapping voices] |
| April 2024 | Defendant | We could hide behind cars. |
| April 2024 | UCE | Yeah. Parking lot. No parking garages, it looks like. And then there's hotels, on the east, west side of side of it. |
| April 2024 | Defendant | If possible, also, we could puncture tires, as many vehicles as possible. So they really can't get away, if they are trying to get away. |
| April 2024 | CHS | It'll still take a while to slice a lot of tires. |
| April 2024 | Defendant | You shoot whatever tires you can, and whatever, puncture. |
| April 2024 | Defendant | But I was thinking about it last night, I say, you know, it |

| | | |
|---|---|---|
| | | seems like we're rushing it. And like what you just said, there's other events, all summer long. |
| April 2024 | CHS | Yeah, that's not why I'm putting--I was feeling the same thing. We don't need to rush it, there's always that 'get it done, type of mindset [overlapping voices] |
| April 2024 | Defendant | I've felt that in your voices. Ok. I was thinking about that too, I said "wait a minute" |
| April 2024 | Defendant | But you know not-not if! have to do that at all. I don't wanna pick up. You don't want to do anything. Uh things I've been looking at too. Check this out, tell me what you think. Mull it over. Remember I mentioned about the Muslims. I'm gonna come over there. I'm not easy about it, but-but you know what—the Muslims. Was thinking up [unintelligible] |
| April 2024 | Defendant | I was thinking too, like, as a back plan. What-what do these, uh, one of these Jewish temples. That would really destabilize things. |
| April 2024 | Defendant | I notice--I noticed the government is actually, from people I talk to, they're keepin' [phonetic spelling] an eye out--Muslims that wanna go to Temples and kill Jews. They don't wanna push it that far. I say, let's push it that far. Let's really destabilize [unintelligible] |
| April 2024 | CHS | So, change of plans? |
| April 2024 | Defendant | No, not-not necessarily. I just want you guys to think about it, mull it over-- |
| April 2024 | Defendant | You know, there's nobody in charge here. We're not doing anything for, like, a loop hole--we're doing it to start a war [unintelligible] you know, a civil war. |
| April 2024 | Defendant | That's the only reason. We're not doing political statements and, like, 'member we talked about what time going up against, like, some of these places--like, I get [unintelligible] |
| April 2024 | Defendant | Now, what happens if a bunch of Jews get killed at Temple? [unintelligible] Christians will join up with the Jews. |
| April 2024 | CHS | Uh, my guess-- |
| April 2024 | Defendant | They will, they will. |
| April 2024 | CHS | I don't think they'll be as militant as the Muslims would be, that's for sure. |
| April 2024 | Defendant | How do you know? They would--they would be scared--remember, people being scared brings out all the action more than anything else |

| April 2024 | CHS | Now, that's true. So, the whole psychology could work. |
|---|---|---|
| April 2024 | Defendant | Just-just talk it over. |
| April 2024 | Defendant | tell me what-what you think. Like I said, there's nobody in charge here. All we're doing is-- |
| April 2024 | Defendant | See, right now, I-I look at it, it's there every day and they're getting worse. They're getting worse. What if there was--something happened because of that, right? |
| April 2024 | Defendant | I don't give a shit. I've been to Israel. |
| April 2024 | Defendant | I make money in Israel with the [unintelligible] I-I don't like [unintelligible] but-but-- |
| April 2024 | Defendant | But maybe we'll unite some of these white people together, yeah. |
| April 2024 | Defendant | It could be, like, you know, killing two-two birds with one shot, that kinda [phonetic spelling] deal. |
| April 2024 | Defendant | You-you know what I mean? And, it would start to [unintelligible] the white people. It really show how bad this government is. People would react. |

*May 2024:  Gun Show in Tucson & Arrest of the Defendant in New Mexico*

At a gun show in Tucson on May 5, 2024, the Defendant told the CHS he was headed East the following week to conduct reconnaissance.  On May 14, 2024, agents observed the Defendant headed East on I-40.  A stop and arrest of the Defendant was conducted in New Mexico. Seven firearms were discovered in the Defendant's vehicle. The Defendant indicated that he was headed to Florida to visit family.

Following his arrest, the Defendant was interviewed in New Mexico.  The Defendant admitted that he spoke with the CHS and UCE about starting a revolution. To do so, the Defendant reasoned that they should go after the government and people of other races.  He went on to say that a mass casualty shooting in a large city would be a good way to start the revolution. He admitted that they would need to kill many people to get the revolution going. He admitted to talking with the CHS and UCE about doing a shooting in Atlanta to start a race-war, and that they discussed it as though it were a plan.  The Defendant admitted that they discussed some specifics regarding how they would carry out the shooting.  The Defendant did not recall his exact words but admitted that he advised the UCE to use the Quentin Defense AR-15 he had sold the UCE to conduct the mass

- 12 -

shooting in Atlanta. The Defendant denied that he ever would have gone through with the plan. The Defendant thought he may have said something about targeting African Americans but did not recall the actual words he used.

A search warrant was executed at the Prescott Valley residence on May 16, 2024. Agents found over 150 firearms, belonging to Individual 1 and the Defendant.  Among the Defendant's firearms was a Zastava 7.62 rifle with a barrel of less than 16 inches, the legal limit. That short-barreled rifle was not registered to the Defendant in the National Firearms Registration and Transfer Record, as required to be legally possessed.

The Defendant was ordered detained pending trial.  Sentencing is scheduled for July 13, 2026.  He will have served 790 days (about 26 months) of pre-trial detention.

## II.    PLEA AGREEMENT

The defendant pleaded guilty to Count 3 of the indictment charging the Defendant with Transferring a Firearm for Use in a Crime of Violence, a Hate Crime.  (Doc. 58.)  The parties stipulated that: (1) the Defendant transferred two firearms knowing or having reason to believe that such conduct would result in the receipt of the firearm by an individual who intended to use or dispose of the firearms unlawfully pursuant to § 2K2.1(b)(6)C)(i)(III); (2) the United States could prove beyond a reasonable doubt that the defendant selected the intended victims of the offense of conviction because of the victim's race § 3A1.1(a); (3) the Defendant's sentence would not exceed the low-end of the guideline range or time-served, which ever was greater; (4) the Defendant would be placed on a term of supervised release of three years; and (5) the Defendant will participate in outpatient mental health assessment and participate in outpatient mental health treatment as directed.  *Id.* The United States also agreed to recommend that §§ 2K2.1(b)(7)(B) and 2K2.1(c)(1) do not apply.  *Id.*

## III.    PRESENT INVESTIGATION REPORT

The Sentencing Guidelines range is the "starting point and the initial benchmark" for all sentencing proceedings and should be "kept in mind throughout the process." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (citations omitted). The

Sentencing Guidelines range is not presumed to be reasonable but instead is only one of the § 3553(a) factors to be considered by the Court.  *Id.*

Probation calculates the Defendant's base offense level at 12.  (PSR ¶ 32.)  Five levels were added because the Defendant transferred two firearms to the UCE knowing that the UCE wanted to commit a mass shooting.  (PSR ¶ 33.)  Three additional levels were added because the Defendant intentionally targeted African Americans because of their race to incite a race war.  (PSR ¶ 34.)  After a three-level reduction for acceptance of responsibility, Probation calculates the Defendant's offense level at 17, criminal history category (CHC) I (24 to 30 months).  (PSR ¶ 46.)  Probation recommends a sentence of time served.  (PSR at 16.)  Among the special conditions of the Defendant's supervised release, the Defendant will be required to participate in mental health treatment, participate in a residential program for up to 180 days, and complete 200 hours of community service.  (PSR at 20.)

The United States agrees with the calculations in the PSR.  Pursuant to the plea agreement, the United States respectfully requests that the Defendant be sentenced to time served to be followed by three years of supervised release.  The United States requests that the Defendant be required to comply with the special conditions of supervised release noted in the PSR.  Based on the nature of the offense and the characteristics of the Defendant, the United States believes that all the conditions are necessary and appropriate.

IV.    ANALYSIS OF SENTENCING FACTORS AND RECOMMENDATION

a.  History and Characteristics of the Defendant

The Defendant is 60 years old.  (PSR at 2.)  The Defendant's sister reported that she and the Defendant experienced childhood trauma.  (PSR ¶¶ 54, 61.)  Other than working odd jobs, it does not appear that the Defendant has had stable employment since 2009.  (PSR ¶ 69.)  At the time of the offense, the Defendant was Individual 1's caretaker and lived with him at the Prescott Valley residence.  (PSR ¶ 57.)  To his credit, the Defendant has no criminal history.

Since the Defendant's detention pending trial, Individual 1 passed and his family support is minimal.  (PSR ¶¶ 56-60.)  He also lacks stable employment history and a place to live when he is released. (PSR ¶¶ 60, 69).  The Defendant's possible childhood trauma and lack of social stability are concerning.  The Defendant would benefit from mental health treatment, participation in a residential reentry program, and other services that Probation can afford him.

This factor favors a sentence of time served (26 months) to be followed by three years of supervised release.  The imposition of the special conditions of supervised released is also requested, participation in a residential program, and 200 hours of community service.

b.  The Nature and Circumstances of the Offense

The Defendant pleaded guilty to Transferring a Firearm for Use in Crime of Violence, that is a Hate Crime.  (PSR ¶ 2.)  Specifically, the Defendant sold the UCE an AR-style rifle on March 23, 2024.  (PSR ¶ 18.)  Previously, on February 25, 2025, the Defendant also sold the UCE an AK-style rifle.  (PSR ¶ 16.)  The Defendant believed that the UCE shared his racist beliefs and hoped to carry out a mass shooting to incite a race war.  The Defendant selected the initial intended victims of the mass shooting because of their race (African Americas).  (PSR ¶ 15.)  Later, the Defendant brought up the possibility of targeting Jews and Muslims.  Throughout the investigation, the Defendant had extensive recorded discussions with the UCE and CHS regarding the reasons why a mass shooting was necessary to incite a race war and plans on how to go about doing it.

As shown above, discussions in April 2024 showed hesitation by the Defendant to participate in the mass shooting.  Over time, investigators developed a subjective suspicion that the defendant wanted a race war and changes to the government but was unlikely to personally take part in violent acts to make that happen. There was no evidence found in his vehicle when he was arrested that he planned to conduct reconnaissance prior to the mass shooting. While, arguably, the Defendant may not have had any intention of participating in a mass shooting, he still sold two firearms to the UCE while believing that

the UCE wanted to carry out a mass shooting to incite a race war.  To be clear, the Defendant was not charged for his racist beliefs or speech.  He was charged because he sold two firearms to an individual who he believed wanted to commit a mass shooting that targeted African Americans.  Fortunately for the Defendant, that individual was a government agent who had no intention of carrying out a mass shooting.

Unfortunately, the United States is suffering from a pandemic of mass shootings. So much so that unless the mass shooting is particularly egregious, information about it quickly passes through the "news cycle" and does not long capture headlines.  None of our public spaces are safe as there have been mass shootings in schools, places of worship, workplaces, stores, concerts, bars, clubs, and the list goes on and on. Law enforcement must take every threat to commit a mass shooting very seriously.

After the FBI received the information from CHS that the Defendant had made alarming statements about a conducting mass shooting targeting African Americans, Jews, and Muslims to incite a race war, it went into overdrive to fully identify and locate the Defendant.  It is the responsibility of law enforcement to prevent mass shootings and keep our communities safe.  The FBI, when it first received this information, had no idea whether the Defendant was in fact interested in committing the mass shooting himself and if he was working with other-likeminded individuals to commit the mass shooting or another type of violent attack. Because the Defendant passed himself off as Individual 1 at times and falsely claimed travel and military experience that he did not have, the FBI had difficulty ascertaining the Defendant's identity.  The FBI's concern over the Defendant's intentions increased when it was determined that the Defendant had access to many firearms.

The FBI did not find any evidence that the Defendant was working with others to commit a mass shooting or that he was traveling to Atlanta to conduct reconnaissance when he was arrested in May 2024.  However, the FBI did not know this when the investigation began and as it progressed.  All FBI could do was hope it could prevent the next mass shooting.

This factor favors a sentence of time served (26 months) to be followed by three years of supervised release.

c. The Need for Adequate Deterrence

Title 18, United States Code, Section 3553(a) expressly provides for the court to consider general deterrence in making its sentencing determination. Section 3553(a)(2)(B) states that "[t]he court, in determining the particular sentence to be imposed, shall consider the need for the sentence imposed to afford adequate deterrence to criminal conduct."

As mentioned above, mass shootings are unfortunately not unusual. It is also not unusual for others to provide individuals who commit mass shootings or other acts of violence with firearms while knowing of their violent intentions. While the investigation focused on the Defendant's intentions to commit a mass shooting to incite a race war, the Defendant was charged with selling two firearms to the UCE while believing that the UCE intended to carry out a mass shooting to incite the hoped-for race war – that was the crime.

It is hoped that a sentence of time served (26 months) to be followed by three years of supervised release will deter the Defendant from getting himself involved in other criminal activity and also deter others from providing would-be mass shooters and other criminals with firearms if they are exhibiting alarming behavior or making concerning statements about committing acts of violence or other crimes.

d. Not Create Unwarranted Disparity Among Defendants

Title 18, United States Code, Section 3553(a)(6) states that in formulating a sentence, a court should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In *United States v. Saeteurn*, the court noted that "sister circuits generally agree that 'Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case.'" *Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007) (*citing United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006).

The Defendant's guideline range is OL 17, CHC I (24 to 30 months). He will serve 790 days (26 months) pre-trial incarceration. A sentence of time served (26 months) is

about seven months lower than the mean sentence (33 months) and slightly higher than the median sentence (24 months) for defendants sentenced for firearms offenses in the Ninth Circuit in 2025.  Statistical Information Packet, Fiscal Year 2025, Ninth Circuit, United States Sentencing Commission (2025).  Therefore, a sentence of time served in this case will not create unwanted sentencing disparities with other defendants sentenced for firearms offenses in the Ninth Circuit.

V.    CONCLUSION

For the above reasons, the United States respectfully requests that the Defendant be sentenced to time served to be followed by three years of supervised release. As stipulated in the plea agreement, the United States also requests that the Court specifically find beyond a reasonable doubt that the Defendant selected the intended victims of the mass shooting because of their race pursuant to § 3A1.1(a).  Additionally, the United States believes that the Defendant will benefit from the imposition of both the mandatory and special conditions, participation in a residential program, and community service.

Respectfully submitted this 6th day of June, 2026.


TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*s/Maria R. Gutierrez*
MARIA R. GUTIERREZ
GLENN B. McCORMICK
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

Michael Shay Ryan & Madeline Mayer, Attorneys for Defendant.

*s/Theresa A. Hanson*
U.S. Attorney's Office